[No. F047029. Fifth Dist. Mar. 9, 2006.]

NORTH AMERICAN BUILDING MAINTENANCE, INC., Plaintiff and Appellant, v.
FIREMAN'S FUND INSURANCE COMPANY, Defendant and Respondent.

628

COUNSEL

Sagaser, Jones & Hahesy, Patrick D. Toole and Scott D. Laird for Plaintiff and Appellant.

Carlson, Calladine & Peterson, Robert M. Peterson and Michael C. Cooper for Defendant and Respondent.

OPINION

**DAWSON, J.**—The question presented is whether an insurance company owes a duty to defend its insured, under a commercial general liability (CGL) policy, against a suit brought by employees of another business, which has a subcontracting relationship to the insured, alleging assorted labor violations as well as a cause of action for false imprisonment. The insurance company argues there is no duty to defend because the CGL policy includes an exclusion for employment-related claims. The parties filed cross-motions for summary adjudication. The trial court ruled in favor of and granted judgment for the insurance company. We will reverse.

## FACTS AND PROCEEDINGS

North American Building Maintenance, Inc. (NABM), which has its principal place of business in Fresno, provides commercial janitorial services to other companies throughout California. One such company was Target Stores, operated by the Target Corporation, Inc. (Target), with which NABM had a "Floor Maintenance Service Agreement" starting December 9, 1999, and continuing until Target cancelled the agreement on August 13, 2001. NABM, in turn, subcontracted with California Building Management Services (CBMS) to perform the actual work at individual Target stores, including those in Santa Barbara County. It was employees of CBMS who brought the underlying lawsuit against NABM and, as well, Target and others.

*The Santa Barbara Complaint*

In September of 2002, three former janitorial workers at a Target store in Santa Barbara filed a "First Amended Class Action Complaint for Damages and Injunctive Relief" (the Santa Barbara action) against Target, Dayton Hudson Corp. (identified as Target's parent company), and "North American Building Maintenance, Inc., . . . [doing business as] California Building Management Services." The complaint, which asserted 11 causes of action, alleged generally that "the defendants" had failed to pay janitorial workers the promised hourly wage and/or pay them for all the hours they worked;

they had failed to give the workers an accurate report of their hours and wages; they had failed to provide workers with required meal breaks; and they had falsely imprisoned workers by locking them inside the stores at night while they were working, and sometimes after their shifts had ended.

In paragraph No. 77, the complaint in the Santa Barbara action alleged that "[w]hile working for Defendants, Plaintiffs . . . were frequently locked in the business premises without exit keys and without a non-alarm exit available and against their will. Defendants demanded, as a condition of work and employment, and without notification prior to employment, that Plaintiffs . . . remain locked in the store where they were performing their night-shift janitorial services, throughout their entire work shifts, against their will, and kept [plaintiffs] locked in the facility even after the janitors' work shifts had ended, until an agent of the Defendant arrived with a key or otherwise unilaterally decided acted [*sic*] to release the janitor crew from the store premises."

NABM tendered defense in the Santa Barbara action to the Fireman's Fund Insurance Company (Fireman's Fund), on the theory there was potential liability and, thus, the potential right to indemnification and a duty to defend on the false imprisonment claim. Fireman's Fund denied it had any duty to defend NABM on any cause of action, including the alleged false imprisonment.[1]

*The Insurance Policy*

NABM had a CGL policy (CG 00 01 07 98) with Fireman's Fund covering the period from February 1, 2001, to February 1, 2002.[2] "Coverage B" in the policy applied to NABM's liability for "personal and advertising injury" (as

---

[1] The parties to the present action appear to agree that, if Fireman's Fund had a duty to defend NABM with reference to the false imprisonment cause of action, it was required either to provide a defense for the entire action or "produce[] undeniable evidence supporting an allocation of a specific portion of the defense costs to a noncovered claim." (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792] (*Horace Mann*).) Fireman's Fund does not assert any need for allocation but, instead, argues against a duty to defend as to the only cause of action—false imprisonment—for which NABM asserts the duty applied.

[2] The three named plaintiffs in the Santa Barbara action, and the dates they alleged they had been employed by "the defendants," were: Jorge Hernandez, May 24, 2001, to June 26, 2001; Aida Sarabia, June 12, 2001, to July 17, 2001; and Ismael Silva, June 28, 2001, to August 3, 2001.

opposed to "bodily injury and property damage liability" in "Coverage A"), and it provided in part as follows (the boldfaced terms were defined elsewhere in the policy):[3]

### 1. Insuring Agreement

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of **personal and advertising injury** to which this insurance part applies. We will have the right and duty to defend the insured against any **suit** seeking those damages. However, we will have no duty to defend the insured against any **suit** seeking damages for **personal and advertising injury** to which this insurance does not apply. . . . [¶] . . .

"b. This insurance applies to **personal and advertising injury** *caused by an offense arising out of your business* but only if the offense was committed in the **coverage territory** during the policy period.

"2. **Exclusions**

"This insurance does not apply to:

"a. **Personal and advertising injury**:

"(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury**; [¶] . . . [¶]

"(5) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement[.]" (Italics added.)

"Personal and advertising injury" was defined in the policy as follows:

"14. **Personal and advertising injury** means injury, including consequential **bodily injury,** arising out of one or more of the following offenses:

"a. False arrest, detention or imprisonment;

"b. Malicious prosecution or abuse of process;

---

[3] For a discussion of the evolution of CGL policies to include coverage for personal and advertising injury liability, and the differences between the two types of coverage, see Croskey and Heeseman, California Practice Guide: Insurance Litigation (The Rutter Group 2005) ch. 7C.

"c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

"d. Oral, written, televised or videotaped publication of material that slanders or libels a person or organization or disparages a person's or organizations goods, products or services;

"e. Oral, written, televised or videotaped publication of material that violates a person's right of privacy;

"f. The use of another's advertising idea in your **advertisement**; or

"g. Infringing upon another's copyright, trade dress, trademark or slogan in your **advertisement**.

"h. **Discrimination**."[4]

The policy's coverage exclusions relating to coverage for personal and advertising injury were supplemented by an "Employment-Related Practices" liability exclusion (EPL exclusion) set out in an endorsement (CG 21 47 07 98). That exclusion provided:

"B. The following exclusion is added to Paragraph 2., **Exclusions of Section I—Coverage B—Personal and Advertising Injury Liability**:

"This insurance does not apply to:

"**Personal and advertising injury** to:

"(1) A person arising out of any:

"(a) Refusal to employ that person;

"(b) Termination of that person's employment; or

---

[4] Thus, personal and advertising injury may involve purely economic losses, irrespective of whether the claimant also suffered any bodily injury or property damage. (Croskey & Heeseman, Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 3:113, p. 3-37.) That is, "personal injury" is different from "bodily injury." It is the insured's wrongful act, not an injury to the third party claimant, that triggers coverage for personal injury. (*Id.*, ¶ 7:1067, p. 7C-30; *Martin Marietta Corp. v. Insurance Co. of North America* (1995) 40 Cal.App.4th 1113, 1125 [47 Cal.Rptr.2d 670].)

"(c) Employment-related practices, policies, acts or omissions, such as Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

"(2) The spouse, child, parent, brother or sister of that person as a consequence of **personal and advertising injury** to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

"This exclusion applies:

"(1) Whether the insured may be liable as an employer or in any other capacity; and

"(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury."

The policy also included an "Employment-Related Practices Liability" endorsement (EPL endorsement) (EP 70 01 04 98) providing "claims-made" *coverage* for "wrongful employment practices" very similar to the "employment-related practices" specifically *excluded* from the policy's personal and advertising injury liability coverage by the EPL exclusion.[5] The EPL endorsement provided coverage for claims made against the insured during the policy period or during an extended reporting period if the insured had elected to purchase one. NABM had not purchased such an extension, and the Santa Barbara action was filed after the policy expired.

*The Refusal to Defend*

The refusal by Fireman's Fund to defend NABM was based principally on the EPL exclusion. In a letter rejecting NABM's tender offer, Fireman's Fund stated: ". . . All of the causes of action [in the Santa Barbara action],

---

[5] A "wrongful employment practice" was defined in the endorsement as follows: "J. **Wrongful Employment Practice** means one or more of the following directed against any **employee**, former **employee** or applicant for employment by you, if arising out of the following: [¶] (1) Wrongful refusal to employ an applicant for employment; [¶] (2) Wrongful failure to promote an **employee**; [¶] (3) Wrongful demotion, evaluation, reassignment or discipline of your **employee**; [¶] (4) Wrongful termination of your **employee's** employment with you, including constructive discharge; [¶] (5) Harassment, coercion, humiliation or discrimination as a consequence of an **employee's** race, color, creed, national origin, marital status, medical condition, gender, age, physical appearance, physical or mental impairments, pregnancy, sexual orientation or preference; or any other protected class or characteristic established by any federal, state or local statutes, rules or regulations; or [¶] (6) **Personal injury,** if arising from 1. through 5. above."

including the false imprisonment claim, are specifically alleged to arise out of employment related practices, policies, acts or omissions. Thus, the exclusion applies to all of them. It is also noteworthy that this exclusion applies 'whether the insured is liable as an employer or in any other capacity'. Thus, whether this exclusion is applied to NABM or Target (were it an insured), coverage would be excluded."

NABM argued the EPL exclusion did not apply. In a letter to the attorney for Fireman's Fund, NABM's attorney asserted: "[T]he [EPL] exclusion only applies to NABM employees. The named Plaintiffs [in the Santa Barbara action] are actually employees of an independent contractor, California Building Management Services (CBMS). That is the reason Plaintiffs amended their Complaint. CBMS is **not** a [doing business as] of NABM as alleged in the previous pleadings. They are two separate companies."[6]

*The Complaint*

On October 1, 2003, NABM filed the present action against Fireman's Fund for breach of contract, insurance bad faith, unfair business practices, and declaratory relief.

Fireman's Fund answered the complaint on November 6, 2003.

*The Motions for Summary Adjudication*

On March 19, 2004, NABM and Fireman's Fund each filed a motion for summary adjudication as to NABM's claims for breach of contract and declaratory relief, limited to the question whether Fireman's Fund had a duty to defend NABM in the Santa Barbara action against the claim for false imprisonment (irrespective of any duty to indemnify).[7] The parties' respective positions looked again to the applicability of the EPL exclusion and the question whether the exclusion for employment-related practices applied to claims brought by persons who were *not* NABM employees.

The parties submitted a joint statement of undisputed facts (while each reserved the right to argue some of the facts were irrelevant or immaterial). They agreed that the plaintiffs in the Santa Barbara action worked for CBMS rather than NABM, that CBMS was an independent contractor hired by NABM, and that NABM was not a "doing business as" of CBMS (or vice versa).

---

[6] It is not clear how the complaint in the Santa Barbara action was amended as the letter asserts, or when the amended complaint was filed or served.

[7] The parties agreed, however, and continue to agree, that a ruling against NABM, on the limited question of Fireman's Fund's duty to defend, effectively calls for judgment against NABM on its entire action against Fireman's Fund.

The competing motions came to a hearing on July 20, 2004.

*The Trial Court's Order*

The trial court issued a 38-page written order on September 15, 2004, granting the summary adjudication motion by Fireman's Fund and denying the one by NABM. The court explained:

"[Fireman's Fund] argues that because the claim of false imprisonment would not be covered if the [Santa Barbara action] plaintiffs were clearly NABM employees, the fact that NABM claims that the plaintiffs' allegations are false should not trigger coverage of claims that, if true, would not be covered. As [Fireman's Fund] notes, there would be no other basis for finding NABM liable to [the Santa Barbara action] plaintiffs other than the intentionally ambiguous employment relationship.

"[NABM] claims the language 'whether the insured may be liable as an employer or in any other capacity' must reasonably be restricted to situations where the insured is a potential vs. an actual employer, while [Fireman's Fund] argues, in the court's view more reasonably, that this language was intended to include vicarious liability in joint employment or hirer/independent contractor situations.

"Given that neither party has introduced any facts to show any other basis on which NABM could potentially be liable to the [Santa Barbara action] plaintiffs other than as an employer or quasi-employer, it appears there is no 'potential liability' because the only pleaded or plausible liability is as an employer or as one obliged to 'repay someone else who must pay damages because of the injury.' "

The court then concluded: "Based upon the foregoing, the court denies summary adjudication to . . . NABM as to the first and fourth causes of action [for breach of contract and declaratory relief, respectively], and grants summary adjudication to [Fireman's Fund], since the unambiguous language of the EPL exclusion bars coverage if any listed 'personal injury' arose out of 'employment related practices.' The court finds, as a matter of law, that any alleged false imprisonment 'arose out of' an employment practice, and if NABM's only defense is that it was not the employer, that would not trigger any duty on the part of [Fireman's Fund], since [NABM's] only possible liability would be as an employer."

Judgment in favor of Fireman's Fund was entered on October 13, 2004. Fireman's Fund served notice of entry of judgment on October 28th. NABM filed a timely notice of appeal on December 15, 2004.

## DISCUSSION

*The Duty to Defend*

■ "It has long been a fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).)

The insurer must defend any claim that would be covered if it were true, even if in fact it is groundless, false, or fraudulent. (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 273 [54 Cal.Rptr. 104, 419 P.2d 168] (*Gray*).) "Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." (*Horace Mann, supra*, 4 Cal.4th at p. 1081.)

"[T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint [will] give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citations.] [¶] Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. [Citations.] This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy. [Citations.]" (*Waller, supra*, 11 Cal.4th at p. 19.)

■ Stated in another way, " 'the insurer need not defend if the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' " (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*).) Thus, when the duty to defend is the subject of an action for declaratory relief, the parties have differing burdens.

"To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*. Facts merely

tending to show that the claim is not covered, or may not be covered, but [that] are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity in the respective burdens merely reflects the substantive law." (*Montrose, supra*, 6 Cal.4th at p. 300.)

Further, in determining whether a potential for coverage is present, potential amendments to the third party complaint must be considered. As stated in *Montrose, supra*, 6 Cal.4th 287, "the insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy." (*Id.* at p. 299, citing *Gray, supra*, 65 Cal.2d at pp. 275–276.)

It follows that, in a summary judgment proceeding, an insurer may prevail only upon a showing that eliminates any potential for coverage under the policy as a matter of law. (*Maryland Casualty Co. v. National American Ins. Co.* (1996) 48 Cal.App.4th 1822, 1832 [56 Cal.Rptr.2d 498].)

*The EPL Exclusion*

As we have said, the present dispute focuses on the EPL exclusion insofar as it precludes coverage for claims that otherwise would fall within the insuring agreement for personal and advertising injury. (See *Waller, supra*, 11 Cal.4th at p. 16 [CGL policy has two essential parts: an insuring agreement that identifies covered risks, and exclusions that remove coverage for some such risks].) The parties thus seem to agree as a threshold matter that the false imprisonment allegation in the Santa Barbara action comes within the insuring agreement. (See *ibid.* [risks not covered in first instance need not be specifically excluded; initial burden is on insured to show claim is within scope of coverage, then on insurer to show exclusion applies].)

NABM argues the exclusion does not apply because the plaintiffs in the Santa Barbara action were not NABM employees; Fireman's Fund argues this fact is immaterial. We will agree with NABM.

A. *Did the trial court misapply the law regarding potential coverage?*

NABM begins by challenging what it claims was a "finding" by the trial court that, notwithstanding undisputed facts to the contrary, the Santa Barbara action plaintiffs actually *were* employed by NABM. This assertion is based on the following excerpt from the trial court's order:

"Here, the [Santa Barbara action] plaintiffs have alleged that NABM exerted significant control over them, but NABM denies this and [Fireman's

Fund] appears to concede, without any reference to an investigation concerning this factual issue, that [NABM] is not the employer. However as noted above, that does not necessarily mean that there is no unresolved factual issue in the underlying case, since it is possible that NABM is settling to avoid a finding that it is the employer.[8]

"In any case, [Fireman's Fund] argues that because the claim of false imprisonment would not be covered if the [Santa Barbara action] plaintiffs were clearly NABM employees, the fact that NABM claims that the [Santa Barbara action] plaintiffs' allegations are false should not trigger coverage of claims that, if true, would not be covered. As [Fireman's Fund] notes, there would be no other basis for finding NABM liable to [the Santa Barbara action] plaintiffs other than the intentionally ambiguous employment relationship."

Hence, the trial court did *not* "find" that the Santa Barbara action plaintiffs were NABM employees; it only observed that there was a factual disagreement between the allegations in the complaint and the extrinsic information provided by NABM as to which of the defendants actually employed the Santa Barbara action plaintiffs and/or controlled their wages and working conditions. (This is so irrespective of the court's unwarranted speculation about NABM's motives for settling with the Santa Barbara action plaintiffs.) It then, however, appears to have concluded that, because there "would be no other basis for finding NABM liable" than an employment relationship, there was no potential for coverage and no duty to defend. This was not and is not an issue raised directly by Fireman's Fund. Its position is different in that it argues the EPL exclusion applies whether the Santa Barbara action plaintiffs were employees of NABM or of CBMS. We will, nonetheless, consider whether the trial court correctly applied the law in reaching the quoted conclusion.[9]

The trial court was correct in its major premise that, if NABM's only potential liability was, as a matter of law, as an employer, then Fireman's Fund would not owe NABM a defense. While an insurer must defend any claim that would be covered if true, even though the claim is in fact false (see *Horace Mann, supra,* 4 Cal.4th at p. 1088 (conc. opn. of Baxter, J.); *A-H Plating, Inc. v. American National Fire Ins. Co.* (1997) 57 Cal.App.4th 427, 442 [67 Cal.Rptr.2d 113]), an insurer has no duty to defend a noncovered

---

[8] The record reflects that, by the time it filed the complaint in the present action, NABM had settled with the plaintiffs in the Santa Barbara action for $200,000.

[9] This is not to suggest, however, that we review the trial court's reasoning for error. (See *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [35 Cal.Rptr.2d 698] [review of trial court's ruling, not its reasoning].) On appeal from a grant of summary judgment, our review is de novo. (*Ibid.*)

claim even if the claim is false. (See, e.g., *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 539 [12 Cal.Rptr.2d 629]; *Jaffe v. Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 935 [214 Cal.Rptr. 567]; see generally Croskey & Heeseman, Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 7:520 to 7:560.11, pp. 7B-9 through 7B-20.)

■ The trial court was incorrect, however, in its minor premise—that NABM could be liable only as an employer or quasi-employer. Broadly speaking, there appears to be no impediment to holding a nonemployer liable for the false imprisonment of another employer's employee. False imprisonment is a generic, not an employment-specific tort. None of the elements of the tort require an employment-related showing. (See Judicial Council of Cal. Civ. Jury Instns. (2006) CACI No. 1400 [elements].) The trial court appears not to have considered the nature of false imprisonment in drawing its conclusion as to NABM's potential liability. Neither did Fireman's Fund do anything to show that NABM could in no way be found liable for false imprisonment of the Santa Barbara action plaintiffs.

The duty to defend is excused only where " 'the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' " (*Montrose, supra*, 6 Cal.4th at p. 300.) Further, on a motion for summary judgment regarding its duty to defend, the insurer must be able to negate any potential coverage as a matter of law. (*Maryland Casualty Co. v. National American Ins. Co., supra*, 48 Cal.App.4th at p. 1832.) We proceed, therefore, to the issue of contractual interpretation presented, which will resolve this case.

### B. *Does the EPL exclusion apply to claims by nonemployees?*

Fireman's Fund contends it is immaterial whether the Santa Barbara action plaintiffs were employees of NABM or of CBMS because the language of the exclusion is broad. It relies on the following italicized language from the EPL exclusion, which provides: "This insurance does not apply to: [¶] . . . [p]ersonal and advertising injury to: [¶] . . . [*a*] *person* arising out of any: [¶] . . . [e]mployment-related practices . . ." and "This exclusion applies: [¶] (1) Whether the insured may be liable as an employer *or in any other capacity*; and [¶] (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury." (Italics added, boldface omitted.)

NABM contends (1) that the EPL exclusion applies only where there is an employment relationship between the insured and the third party claimant; and (2) in the alternative, that the language of the exclusion is reasonably interpreted as requiring an employment relationship, and any ambiguity must

be resolved in favor of the insured. We agree with NABM that, at best for Fireman's Fund, the language of the exclusion is ambiguous, and we therefore will find the exclusion does not apply to NABM.

In support of its position, Fireman's Fund notes that the term "any," as in "any other capacity," is an expansive term that means, in effect, "every." In *California State Auto. Assn. Inter-Ins. Bureau v. Warwick* (1976) 17 Cal.3d 190 [130 Cal.Rptr. 520, 550 P.2d 1056], the insurer sought declaratory judgment that it had no duty to defend or indemnify for a claim by the wife, who had been a passenger in a vehicle driven by her husband at the time of an accident, against the husband driver of the vehicle. Both the husband and wife were named insureds under the policy, which provided an exclusion from coverage for injury to "any insured." The court looked to the meaning of "any": "From the earliest days of statehood we have interpreted 'any' to be broad, general and all embracing. In *Davidson v. Dallas* (1857) 8 Cal. 227, 239, this court declared the 'word "any" means every, and the expression "for these purposes or any of them" in effect reads: "for the foregoing purposes and every of them." ' [Citations.] [¶] In view of the popular and accepted meaning of the word 'any,' the term 'any insured' unmistakably refers to any person insured under the policy, whether such person is a named or unnamed insured, a driver or a passenger." (*Id.* at p. 195.)

We find this opinion only marginally helpful, however, because it interprets the word "any" as a modifier of a defined term—any *insured*—as opposed to "any" as a modifier of an undefined term: "capacity." We find no unmistakable meaning to the term "as an employer or in any other capacity."

We find more helpful the ordinary rules of contractual interpretation, which rules apply to insurance contracts: "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.) On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense . . .' [that] protects . . . 'the objectively reasonable expectations of the insured.' [Citation.]. . . [¶] In . . . attempt[ing] to determine whether coverage is consistent with the insured's objectively reasonable expectations[,] . . . the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because 'language in a contract must be construed in the context of that instrument as a whole . . . and cannot be found to be ambiguous in the abstract.' [Citations.]" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545], quoting *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986)

41 Cal.3d 903, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920], italics omitted; see also *Feurzeig v. Insurance Co. of the West* (1997) 59 Cal.App.4th 1276, 1283 [69 Cal.Rptr.2d 629].)

Particular rules apply to the interpretation of insurance policy exclusions: "In addition to the general contract interpretation rules, there are special rules applicable to exclusions. Croskey et al., *California Practice Guide: Insurance Litigation* ¶ 3:138 (Rev. # 1 1996). Thus, although the insured has the burden of proving the contract of insurance and its terms, the insurer bears the burden of bringing itself within a policy's exclusionary clauses. [Citations.] Further, exclusionary clauses are strictly construed against the insurer and in favor of the insured. [Citations.] Thus, any provision that takes away or limits coverage reasonably expected by the insured must be 'conspicuous, plain and clear' to be enforceable. [Citations.]" (*Zurich Ins. Co. v. Smart & Final, Inc.* (C.D.Cal. 1998) 996 F.Supp. 979, 987, fn. omitted; see also *Waller, supra,* 11 Cal.4th at p. 16; *State Farm Mut. Auto. Ins. Co. v. Jacober* (1973) 10 Cal.3d 193, 202 [110 Cal.Rptr. 1, 514 P.2d 953]; *Crane v. State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115–116 [95 Cal.Rptr. 513, 485 P.2d 1129].)

We have noted already that we find no unmistakable meaning to the term "as an employer or in any other capacity." This is particularly true when we read this language in context.

As NABM points out, the other language of the EPL exclusion relates primarily to claims that could only arise in situations of employment, former employment, or prospective employment. The exclusion states the insurance does not apply to personal injury to a person arising out of any "[r]efusal to employ that person[,] [¶] [t]ermination of that person's employment[,] or [¶] [e]mployment-related practices . . . , such as [c]oercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person . . . ." Certainly, a commonsense and, thus, a reasonable understanding of this category of claims is that it relates to actual, former, or prospective employment.

When we examine the provisions of this insurance policy as a whole, we find other reasons to conclude a reasonable interpretation of the EPL exclusion is that it does not apply where the insured is not the employer or former employer, and never was the prospective employer, of the third party claimant. The title of this exclusion—"Employment-Related Practices"—is mirrored in the title of the endorsement by which claims-made coverage is provided for "Employment-Related Practices Liability." This coverage is for claims arising from "wrongful employment practices." (See fn. 5, *ante.*) According to one commentator, this kind of liability coverage is relatively new. It was created in the 1990's, after the Insurance Services Office (ISO)

developed the EPL exclusion which, in turn, was based on an industry concern that, as employment practice claims became more prevalent during the 1980's, coverage for employment practices would eventually be found under a CGL form. The EPL coverage appears to have been developed in response to a market created by narrow court interpretations of CGL coverage of employment-related claims and the increasing use of the EPL exclusion to further limit coverage. (Monteleone & Grotell, *Symposium: Coverage for Employment Practices Liability Under Various Policies: Commercial General Liability, Homeowners', Umbrella, Workers' Compensation, and Directors' and Officers' Liability Policies* (1999) 21 W. New Eng. L.Rev. 249, 249–250, 265, 282.) The market, that is, consists of businesses seeking coverage which is not otherwise available to them in part because of the EPL exclusion. Examining the terms of the coverage provided by the EPL endorsement here, which is on a standard ISO policy form No. EP7001, we learn that it covers "claims"; that **"claim"** means a demand presented by "any **employee**, former **employee** or applicant for employment" with the insured; and that "[e]m-**ployee** means a person employed by you for wages or salary. . . . But **employee** does not include . . . [¶] [a]n independent contractor, or any **employee** . . . of an independent contractor[.]" We can imagine no reason, and Fireman's Fund suggests no reason, why an insured—like NABM—that purchases the extra coverage of the EPL endorsement would not, in the absence of clear language to the contrary, reasonably interpret that coverage as being coextensive with the like-named EPL exclusion. Neither can we imagine why, in fulfilling its customers' need for coverage created by the EPL exclusion, an insurance company—like Fireman's Fund—would fulfill, and charge for fulfilling, only a part of that need.

As noted above, "an exclusionary clause must be conspicuous, plain and clear [citation] and must be construed strictly against the insurer and liberally in favor of the insured [citations]." (*Crane v. State Farm Fire & Cas. Co., supra,* 5 Cal.3d at pp. 115–116.) Applying these rules here, we conclude it is clear the reasonable expectations of NABM must be protected. We hold that the EPL exclusion, as it is worded in the policy under consideration here, does not apply to claims by employees of an independent contractor and thus did not apply here.[10]

---

[10] Given this conclusion, we find no need to proceed to the remaining questions raised by appellant—to wit, whether false imprisonment comes within the meaning of an "employment-related practice" and whether there is a question of fact in this case about whether this false imprisonment in particular was employment related.

## DISPOSITION

The judgment is reversed. Costs are awarded to NABM.

Harris, Acting P. J., and Wiseman, J., concurred.